1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANDREW THOMAS UPTON,                     No. C 06-07854 WHA

           Petitioner,

  v.                                                    **ORDER DENYING PETITION
                                                              FOR WRIT OF HABEAS CORPUS**
MIKE KNOWLES, Warden,

           Respondent.
                            /

**INTRODUCTION**

Petitioner Andrew Thomas Upton seeks federal habeas relief pursuant to 28 U.S.C.

2254. Petitioner was convicted of four counts of child molestation under California law.

The state trial court sentenced him to six years in prison on June 6, 2003. Petitioner contends

that his trial lawyer rendered ineffective assistance. This order rejects petitioner's claims on the

grounds that he failed to show prejudice due to trial counsel's actions. His petition is **DENIED**.

**STATEMENT**

**1.      THE ALLEGED ACTS OF MOLESTATION.**

The jury was asked to decide whether or not petitioner committed lewd and lascivious

acts on his stepdaughter, M.U. At trial, M.U., her mother Jessica, and her aunt Anna Martinez,

testified. Jessica married petitioner on July 1, 2000 and moved into his apartment with her

two daughters, one of whom was ten-year old M.U. They later moved into a home in Tracy,

California (Exh. 4B at 76–79). Jessica left petitioner after a year and three months of marriage

(*id.* at 79).

United States District Court

For the Northern District of California

1    Ms. Martinez took care of M.U. and her sister in early March of 2002.  Ms. Martinez

2  told the girls about an article she was reading in *Newsweek* regarding molestations by priests.

3  M.U. seemed to "have more of a particular interest in the article" (*id.* at 54–55).  The next day,

4  on March 4, 2007, when Jessica picked up her daughters, M.U. asked if she could have a

5  boyfriend and start wearing makeup.  Jessica said no and M.U. began to cry, seemingly about

6  "just teenage, teenage girl stuff."  Later that day, Jessica found M.U. crying and curled up in a

7  fetal position in the corner of a room.  Jessica felt that something else was bothering M.U.

8  besides the boyfriend and makeup issue (*id.* at 83-85).

9    Jessica spent the next two hours trying to find out why M.U. was so upset.  She asked

10  her daughter if anything had happened to her, and M.U. answered yes.  Jessica suspected that

11  somebody had inappropriately touched her, so she began asking M.U. if any individual family

12  members had done something to her.  Jessica named at least five people before she reached

13  petitioner's name.  When Jessica asked M.U. whether petitioner did anything to her, M.U.

14  paused and said yes.  Jessica then asked if petitioner had touched M.U., and M.U. answered in

15  the affirmative.  Jessica told Ms. Martinez, who then called 9-1-1 (*id.* at 85–89).

16    On the day M.U. was scheduled to testify, she ran away in the morning and was gone for

17  twenty minutes before her mother found her (*id.* at 88–89).  At trial, M.U. testified about being

18  molested by petitioner.  She was thirteen at the time of trial.  She recalled petitioner touching

19  her "in a bad way" about ten or eleven times over the course of a few months (*id.* at 71–73).

20  M.U. testified about four specific instances of molestation.  When she was ten or eleven years

21  old, she and her sister were sleeping on the living room floor in their home in San Jose.

22  Petitioner touched her chest and her vagina under and over her clothing.  M.U. moved around

23  and pretended to wake up.  Petitioner restrained her and continued touching her.  She was too

24  frightened to fight back.  She did not tell anyone else what had happened; she feared that

25  "they would confront him and that he would be abusive to them."  M.U. recalled that the

26  "bad touching" occurred more than five times in the living room (*id.* at 113–20).

27    The molestations also occurred in the master bedroom.  M.U. slept between her mother

28  and petitioner in the bed.  M.U. tried to keep her mother awake because she was afraid that

United States District Court

For the Northern District of California

1   petitioner would start touching her again.  But petitioner told her to be quiet, go to sleep, and

2   not wake her mother up.  M.U. appeared to go to sleep.  Petitioner began touching her chest

3   under her clothes.  M.U. tried to move closer to her mother and, perhaps, because he thought

4   that "[M.U.] was going to wake up pretty soon," petitioner fell asleep shortly thereafter.  M.U.

5   did not tell her mother what happened the next day because she was afraid of petitioner's

6   temper.  Even though petitioner had never struck her or her mother, M.U. recalled an incident

7   where petitioner hit her sister after her sister accidentally poked him in the eye (*id.* at 121–25).

8          On another occasion, when M.U.'s mother was at work, she and her sister lay in bed

9   together.  Petitioner had been playing video games in the next room.  After M.U. heard the

10  shooting noises from the video game cease, petitioner came into the bedroom and lay down next

11  to her.  He took her hand and placed it on his penis.  M.U. said nothing and kept her eyes

12  closed.  She was frightened "that if [she] moved then he would notice."  She did not recall why

13  he stopped (*id.* at 125–27).

14         The final specific incident M.U. described was when she, her sister, and petitioner sat on

15  the couch in the living room watching "The Exorcist."  During the movie, petitioner pulled her

16  legs onto his lap.  He then lifted up M.U.'s shirt, dimmed the lights, and touched her chest.

17  M.U. was scared of the movie and what was going on, so she said nothing.  She wiggled around

18  to let petitioner know that she was awake (*id.* at 128-31).

19         M.U. explained that she finally decided to tell her mother because, "having like

20  something that big in the back of my mind, [I] just didn't want it to be there anymore."

21  The *Newsweek* article had inspired her to tell her mother because she read about a teenage boy

22  who "had gone through the same thing, and he never told anybody.  And it was forever, and,

23  like in the back of his mind or something" (*id.* at 136–37).

24         During cross-examination, defense counsel emphasized that, during each of the four

25  aforementioned incidents, there was always somebody else present (*id.* at 138–139).

26  Also, defense counsel brought up the fact that M.U. occasionally play-wrestled with petitioner.

27  M.U. said that petitioner "would pick the play fights with [her and her sister] . . . and then

28  [they would] wrestle him" (*id.* at 147).

3

United States District Court

For the Northern District of California

1    After Jessica told M.U. that she and petitioner were going to get a divorce, M.U. wrote

2    petitioner a series of letters when she was about eleven years old.  In one letter, M.U. said,

3    "I really wanted to spend more time together as a family."  In addition, she wrote, "But it was

4    always phone calls, business, eating too much salsa.  And not eating dinner with us.

5    Doing things on the computer, going fishing, fighting with mom."  She signed the letter,

6    "love" (*i.d.* at 151–55).  In another letter, M.U. said that her mother still wanted to "work it

7    out."  She asked whether "another girl" was involved.  M.U. then indicated, "We will probably

8    never see you again, ever.  I hope you know what you're doing."  Defense counsel also showed

9    another letter where M.U. asked petitioner if he would miss them and whether he liked her art.

10   She then wrote, "I guess not, because even though you said you liked them, you lied . . .

11   You lied about your marriage, now you lied, lied about everything."  In her last letter to

12   petitioner, M.U. wrote, "I hope the next woman you fall in love with doesn't have kids, because

13   you don't know what you put us through" (Exh. 4C at 163–66).

14   On redirect, when the prosecution asked her about those letters, M.U. explained, "I was

15   young back then and I didn't really understand a lot, a lot of things.  And right now is, I mean,

16   all I looked up to him for was like a father figure, and that's all what I wanted him to stick

17   around for, whether he did that to me or not, but that was a long time ago.  I don't think that

18   anymore.  I'm more, I understand myself better" (*id.* at 174).

19        **2.    THE COMPUTER EVIDENCE INTRODUCED AT TRIAL.**

20   To reinforce the requisite criminal intent, the prosecution selected 25–30 images of child

21   pornography acquired by petitioner, some of which were obtained from a CD-ROM given to the

22   investigating officer by petitioner's wife and some of which were obtained from petitioner's

23   computer.  The prosecution selected photographs depicting children who were approximately

24   the same age as M.U. (Exh. 4A at 32–33).

25   Defense counsel argued against admitting evidence of child pornography.  He argued

26   that the child pornography had merely been part of alleged mass downloads and did not

27   necessarily prove that petitioner had seen or was sexually interested in underage children.

28   This evidence, therefore, allegedly had little probative value but would, instead, consume a

United States District Court

For the Northern District of California

1    great deal of time and create a highly prejudicial impact upon the jury (*id.* at 22–23, 27–32).

2    The trial court ruled that the evidence was admissible (*id.* at 35).

3    Officer Kevin Fagalde of the San Jose Police Department testified on behalf of the

4    prosecution as an expert in computer forensics and replication of data.  He had spent over

5    five hundred hours preparing for trial.  He testified about pornographic images found on the

6    computers seized from petitioner's home.  He explained that if a file were never accessed,

7    the file-creation date and the file-access date should be identical.  In this case, the access dates

8    differed from the creation dates for most of the photos submitted into evidence, indicating that

9    petitioner had in fact looked at them (Exh. 4C at 177–238).  "Newsgroups" were websites

10   similar to bulletin boards where individuals could post files and comments and download items

11   onto their computer (*id.* at 193).  Officer Fagalde testified that there were some photos

12   downloaded from the following newsgroups:  alt.binary.nospam.teenfem and

13   alt.binary.nospam.teenfem.repost.  The site alt.binary.picture.erotic.pre-teen showed that it had

14   been picked by a user but no files had been downloaded from it (*id.* at 199–201).  The officer

15   also located the following sites on a Dell laptop found in petitioner's home and accessed by

16   "A. Upton": RealTeenagerSex.Com, LiveAmateurTeenSex.Com, TooYoungGirls,

17   NextDoorTeen.Com, and LiveAmateurTeenSex.Com.  Then somebody logged onto that same

18   laptop as the administrator and accessed these sites:  LolitaSites, LolitaDashSites.com,

19   LolitaTeen.Com, LolitaTeenDashDreamer.Net, TeenGirlSex.Net, and JapanTeens.Com

20   (*id.* at 234–36).

21   Defense counsel did not retain his own expert witness.  He called petitioner instead.

22   Petitioner had obtained a degree in electronic engineering.  He started as a field service engineer

23   working on the semiconductor equipment at K.L.A.-Tencor.  After three years, he was

24   transferred to the training department to teach networking.  After another three years, he

25   became the software manager for the training department (Exh. 4D at 309).  During his trial,

26   petitioner was a consultant for a semiconductor manufacturing company and owned seven or

27   eight computers (Exh. 4D at 309–10).  Petitioner, however, did not know any specifics about

28

5

United States District Court

For the Northern District of California

1   Encase, the computer program used by Officer Fagalde to recover erased files from computers

2   (Exh. 4E at 385).

3       Petitioner admitted that he would download adult pornography to his desktop in mass

4   downloads from various newsgroups.  Whenever he discovered some child pornography that

5   others inserted into the bulk download, he claimed he would delete the photos.  "And if there

6   were too many, [he] would wipe the whole directory out" (Exh.4D at 315–18).

7   Petitioner explained that thousands of these files could be downloaded without his ever viewing

8   them (*id.* at 325).

9       The defense then demonstrated for the jury on a computer in the courtroom how

10  newsgroups were accessed and downloaded and how files were accessed and deleted.

11  Petitioner also testified that the day before, he and defense counsel obtained access to Encase,

12  the prosecution's program designed to preview and recover both deleted and undeleted files

13  from the hard drive.  Petitioner had the person at the computer keyboard go to certain

14  directories to systematically recover each of the images introduced by the prosecution.

15  Petitioner then explained to the jury that these images had been deleted by him earlier and that

16  there was no way to ascertain whether those files had ever been viewed (*id.* at 324–54).

17  Petitioner also testified that some of his friends, who collected adult pornography, came to his

18  house and surfed the Internet (*id.* at 314).

19      During his cross-examination, petitioner confirmed that he had visited sites such as:

20  RealTeenagerSet.com, LiveAmateurTeenSex.com, CyberAge.com,

21  ParticipatingYoungGirls.com, RealTeenageAreaSex.com, NextDoorTeen.com, and

22  LiveAmateurTeen.com.  When asked whether he "chose to visit sites with names that

23  suggested they involved children," petitioner responded, "Not necessarily visit sites."

24  When asked again whether he chose to go to those sites, he answered, "I did not go inside

25  those sites, no, I did not as in I did not pay for it, no" (Exh. 4E at 390–92).  Petitioner explained

26  that a site that advertised as a teen site was not necessarily a teen site and could have adult

27  models (*id.* at 411).

28

6

United States District Court

For the Northern District of California

1        In his closing arguments, the prosecutor concentrated on M.U. and her relatives'

2 testimonies (Exh. 4F at 427–50).  The prosecutor also explained to the jury the purpose of

3 introducing the child pornography and erotica into evidence.  It was brought forth "to show you

4 that the defendant likes young-looking girls or women who look young and that he is highly

5 sexually stimulated with all the pornography he looks at constantly every day.  It goes to his

6 intent.  It goes to his lack of mistake.  He didn't accidentally touch her and there was no

7 testimony he accidentally did anything" (*id.* at 432).  The prosecution also argued, "The

8 defense, their expert is the defendant.  Does anybody see a problem with that?  Does he have a

9 motive to lie in this case?  Absolutely.  He has no experience with Encase, the computer

10 program we talked about.  No experience whatsoever, and he is giving you opinions about what

11 Encase, what it does and what it doesn't do.  He has no experience conducting forensic

12 examinations" (*id.* at 451–52).

13        During closing arguments for the defense, counsel said that he "was going to call an

14 expert witness" but he "got everything [he] needed out of the prosecution expert that [the

15 defense expert] was going to testify to.  It had to do with how this stuff appears on the web."

16 Defense counsel pointed out that Officer Fagalde "never testified that any of the files were

17 viewed . . . , [t]he reason being access date does not mean viewed" (*id.* at 465–65).  He then

18 argued that M.U. was angry at rather than afraid of petitioner, given the content of the letters

19 she sent petitioner after her mother left him (*id.* at 479–85).

20        The jury in the Santa Clara County Superior Court found petitioner guilty of four counts

21 of lewd and lascivious acts on a child under fourteen.  On June 6, 2003, the trial court sentenced

22 him to six years in prison.  Petitioner filed a timely appeal in the California Court of Appeal,

23 which affirmed the trial court's decision.  Petitioner then filed and was subsequently denied a

24 petition for writ of habeas corpus in the Santa Clara County Superior Court.  Petitioner filed the

25 same petition in the California Court of Appeal and in the California Supreme Court.

26 Both courts denied the petition on the merits.  On December 22, 2006, petitioner filed a pro se

27 federal habeas corpus petition pursuant to 28 U.S.C. 2254.  On May 29, 2007, this Court

28 appointed counsel.

United States District Court

For the Northern District of California

### 3.     PROCESS OF SEEKING HABEAS RELIEF.

The petitioner seeks habeas relief on grounds of ineffective assistance of counsel at trial.
He claimed that his trial counsel was ineffective in (1) failing to prepare, retain and call an
expert witness to challenge the prosecution's computer expert; and (2) coercing petitioner to
testify as his own 'expert' witness after counsel failed to deliver on the latter's promise to retain
an independent expert (Pet. Response to Ct. Request for State Court Proceedings at 3).

Petitioner retained Attorney Patrick Clancy as trial counsel.  According to petitioner,
Attorney Clancy originally stated that he routinely worked with a "stable" of defense experts
and that his $75,000 fee would include the retention, preparation, and testimony of expert
witnesses as it became necessary.  After the trial began and Office Fagalde had already testified,
Attorney Clancy conferred with Jon Berryhill, a forensic specialist.  Attorney Clancy, however,
did not actually retain Mr. Berryhill to rebut the prosecution's expert testimony.
Rather, Attorney Clancy decided to call petitioner himself to rebut Officer Fagalde's testimony.
Petitioner states that he repeatedly expressed his reluctance to Attorney Clancy to take the stand
in his own defense.  According to petitioner, Attorney Clancy said that it was now "too late" to
hire an independent defense expert and, unless petitioner took the stand, the jury would be left
without a rebuttal to Officer Fagalde's testimony (Trav. Pts. & Auth. at 5–7).  Finally, "[t]hough
Petitioner did not want to testify, he had no rational basis to oppose what appeared to be a
professional competent opinion, rendered from years of experience.  He eventually caved in to
Attorney Clancy's demands and resignedly took the stand, violated his right against
self-incrimination, [and] regrettably, was convicted" (Pet. at 43).

When petitioner filed state habeas petitions, he included the following exhibits:
a transcript of the testimony of Officer Fagalde, a declaration from computer forensics expert
Ron Short, a declaration from Mr. Berryhill, and a copy of Attorney Clancy's website.
Mr. Short's declaration was one page in length.  Besides qualifying himself as a computer
forensic expert, the remainder of the declaration stated that "it is certainly possible to
unintentionally download certain data elements that the user would otherwise have avoided, had
each data element been individually reviewed prior to the download process."  Mr. Berryhill's

United States District Court

For the Northern District of California

1   declaration was even shorter.  After he qualified himself as the manager and Chief Operating

2   Officer of Berryhill Computer Forensics, LLC, Mr. Berryhill stated that he was contacted

3   around April 3, 2003, by Attorney Clancy.  He "spent approximately two hours working with

4   [Attorney Clancy] to recover the information he sought" and, "to [his] recollection, this was the

5   only time [Mr. Berryhill] was contacted by Attorney Clancy" (Berrhyhill Decl. at 1).

6   Petitioner's state habeas petitions requested "an order for the taking of such evidence as may be

7   necessary for the proper consideration of this petition" (Superior Ct. Pet. at 10, Ct. of Appeal

8   Pet. At 11, Cal. Supreme Ct. Pet. at 10).  The state petitions were denied, however, without any

9   evidentiary hearing ever being conducted.

10          In support of his federal habeas petition, petitioner obtained a longer and more detailed

11   sworn declaration from Mr. Berryhill.  Mr. Berryhill stated that he "was contacted by the

12   original trial counsel, Attorney Clancy, prior to the trial to provide computer forensic support.

13   [Mr. Berryhill] offered both [his] professional services and the use of [his] lab to allow the

14   examination of computer evidence.  Attorney Clancy declined [Mr. Berryhill's] offer of

15   analysis and/or testimony and chose to conduct the analysis himself.  Accordingly, [Mr.

16   Berryhill] provided no input to his analysis or conclusions" (Berryhill Decl. at 3).

17          Mr. Berryhill read the transcript of Officer Fagalde's testimony at this point.

18   Mr. Berryhill made the following main conclusions in his federal declaration in support of the

19   traverse:  (1) it was unclear whether or not the images depicting child pornography were deleted

20   by the user subsequent to their download; (2) differences between the file-access date and

21   file-creation date did not necessarily mean that the image was intentionally saved and viewed

22   by the user because it could also mean that there was "a simple delay in the time when the

23   image was downloaded and when it was first viewed and then deleted"; (3) the government

24   expert failed to discuss other important factors necessary in determining whether the computer

25   user intended to view child pornography (*e.g.*, website names, newsgroup names, search terms,

26   type of images, when they were obtained, their source, their destination on the user's computer,

27   the length of time the images were in the active space, what else was downloaded around the

28   same time, what else was deleted around the time, what had been saved and how the material

9

United States District Court

For the Northern District of California

1    was organized); (4) because there is so much sexually explicit material available on the Internet

2    from free and paid sources, a large portion of it may not necessarily conform to its purported

3    category; (5) it is common to download a newsgroup list that includes tens of thousands of

4    group names, which cannot all be read by the user; (6) it is possible for a user to subscribe to

5    "sites with teen-type names knowing that the material there is almost always legal, adult

6    pornography using adult models"; (7) the act of subscribing to or "opting into" a newsgroup can

7    be merely a selection that makes it easier for the user to download future updates; and (8) many

8    adult sites contain pop-ups that cause many other windows and web sites to pop up without

9    specific user action" (Berryhill Decl. at ¶¶ 7–17).

10           Petitioner also obtained a declaration from the trial judge, William Danser.[1]

11   Petitioner's previous post-conviction attorney wrote in an email to someone named Amy,

12   "I went to visit Judge Danser today and spoke with him at length about [Mr. Upton's] case.[2]

13   It was most encouraging.  He told me, and this is practically verbatim:  'This is one of the only

14   cases I have ever seen where I would hold the defense attorney completely responsible for the

15   outcome.  He lost sight of important issues in favor of impressing everyone with his computer

16   skills and knowledge.  It was a disaster, and I think that but for the lawyer, Mr. Upton would be

17   enjoying his freedom."  This email purporting to express former Judge Danser's thoughts on the

18   matter was forwarded to Danser.  After reading this email, Danser stated in his declaration "that

19   the evidence apart from the computer evidence did not seem to compel a conviction; and that

20   the defense attorney seemed overly enamored with his own computer skills over and above

21   what could be obtained from forensic experts in the field."  He also opined that, "as a general

22   principle, it is counterproductive" for an attorney to put his own client on as an expert

23   (Danser Decl. at 12).  Danser, however, explicitly stated that he did *not* say, "This is one of the

24   only cases I have ever seen where I would hold the defense attorney completely responsible for

25   _____

26   [1] In 2004, former Santa Clara County Superior Judge William Danser was convicted of
     eight misdemeanors.  The following year, the California Commission of Judicial Performance censured him for
     willful misconduct.  In 2006, he was convicted of a felony for fixing parking tickets for his friends and members
27   of the San Jose Sharks and Earthquakes.

28   [2] Information regarding the attorney's email to came from former Judge Danser's declaration.  "Amy"
     was never identified beyond being the recipient of counsel's email.

10

1    the outcome." Danser also denied saying, "[B]ut for the lawyer, Mr. Upton would be enjoying

2    his freedom" (Danser Decl. at 13).

3         Attorney Clancy has not made a declaration to date.

4                                    **ANALYSIS**

5         Petitioner contends that trial counsel was ineffective on two grounds. *First*, trial counsel

6    failed to call an expert in computer forensics to rebut the testimony of the state's expert

7    (Trav. Pts. & Auth. at 12). *Second*, trial counsel enlisted an unwilling petitioner as the

8    defense's forensic expert and thereby compromised petitioner's Fifth Amendment right to

9    decline to testify (*id.* at 23). Respondents claim that the new factual allegations submitted with

10   the traverse were never presented to state court and thus rendered petitioner's claim of

11   ineffective assistance of counsel unexhausted. This order agrees with respondents, finding that

12   petitioner's claims are unexhausted because he never presented the new declarations of Mr.

13   Berryhill and former Judge Danser in his state habeas petitions. But even taking these new

14   declarations into account, petitioner's request must be **DENIED** because he has failed to show

15   prejudice.

16        **1.    EXHAUSTION OF STATE REMEDIES.**

17        According to 28 U.S.C. 2254, habeas relief may be granted if the state adjudication

18   "resulted in a decision that was contrary to, or involved an unreasonable application of the facts

19   in light of the evidence presented in the State court proceeding." Here, the state court decision

20   did not result in a decision that was contrary to, or involved an unreasonable application of the

21   evidence presented in the state court proceeding; Mr. Berryhill and former Judge Danser's

22   declarations were never presented until petitioner sought habeas relief in the federal courts.

23        In order to properly exhaust state remedies, the specific factual basis of the federal

24   claim also must be presented to the highest state court. See *Kelly v. Small*, 315 F.3d 1063,

25   1067–69 (9th Cir. 2003) (finding unexhausted ineffective assistance of counsel and

26   prosecutorial-misconduct claims where specific instances of ineffectiveness and misconduct

27   asserted in federal petition were neither in the California Supreme Court petition nor discussed

28   by the court of appeal) (overruled on other grounds). *See also Gray v. Netherland*, 518 U.S.

United States District Court

For the Northern District of California

1   152, 162–63 (1996) ("[F]or purposes of exhausting state remedies, a claim for relief in habeas

2   corpus must include reference to a specific federal constitutional guarantee, as well as a

3   statement of the facts that entitle the petitioner to relief").

4           New factual allegations will render a claim unexhausted if they "fundamentally alter the

5   legal claim already considered by the state courts." *Vasquez v. Hillery*, 474 U.S. 254, 260

6   (1986). "In habeas proceedings, the federal courts are not free to entertain new evidence that

7   places the claim in a significantly different posture, when that evidence was never presented to

8   the state courts." *Nevius v. Sumner*, 852 F.2d 463, 470 (9th Cir. 1988). "A petitioner does not

9   satisfy the exhaustion requirement by presenting the state courts only with the facts necessary to

10  state a claim for relief." *Gray*, 518 U.S. at 153. If available state remedies have not been

11  exhausted as to all claims, the district court must dismiss the petition. *See Guizar v. Estelle*,

12  843 F.2d 371, 372 (9th Cir. 1988).

13          In *Aiken v. Spalding*, 841 F.2d 881 (9th Cir. 1988), the petitioner sought habeas relief

14  from his first-degree murder conviction. Petitioner's initial interrogation by police had been

15  tape-recorded, unbeknownst to both parties. At a supplemental hearing following a remand

16  from the state supreme court, the officers testified that they did not hear petitioner's request for

17  an attorney or his wish to stop the interrogation. In his federal habeas petition, the petitioner

18  presented new evidence that was "material to the issue of whether the interrogating officers

19  heard and ignored [petitioner's] requests for counsel and for the interrogation to cease." *Id.* at

20  882. This evidence consisted of decibel-level studies by an expert who had examined the

21  original tape recordings using modern sound equipment. The Ninth Circuit stated that the

22  expert's "affidavit substantially improves the evidentiary basis for [petitioner's] right-to-

23  counsel and voluntariness arguments, thereby presenting the very type of evidence which the

24  state should consider in the first instance." *Id.* at 883–84. The Ninth Circuit dismissed the

25  habeas petition without prejudice for failure to exhaust state remedies.

26          The Court finds that the facts in this case are similar to that in *Aiken*. Petitioner had

27  been convicted of child molestation on the basis of testimony by M.U., Jessica, Ms. Martinez,

28  and Officer Fagalde. The prosecution presented images of child pornography allegedly found

12

United States District Court
For the Northern District of California

1   on petitioner's computer to help prove that petitioner had the requisite criminal intent when he

2   touched M.U.  The state court record prior to petitioner's filing of the federal habeas petition

3   did not contain any evidence as to what a computer expert would have said had one been

4   retained to testify on behalf of the defense.  The state court held, "Petitioner has failed to show

5   that hiring a computer expert would have provided any helpful testimony.  Petitioner has

6   provided a declaration by a Ron Short, who states that the pornographic pictures of teenage girls

7   that were found on petitioner's computer could have been downloaded unintentionally.

8   However, Mr. Short's statements still do not controvert the testimony at trial that petitioner had

9   signed up for sites such as RealTeenagerSex.com and LolitaTeen.com" (Pet. Exh. E at 158).

10  The state court also found that petitioner's "assertion that he was coerced into testifying against

11  his will is not supported by any persuasive evidence aside from his own self-serving

12  statements" (*id.* at 159).  Petitioner asked for and was denied an evidentiary hearing in state

13  court on the basis of that record.

14       In his federal habeas petition, petitioner filed new declarations from a computer expert

15  and the state court judge who had presided over his trial.  This evidence was material to the

16  issue of whether or not Mr. Clancy's representation was reasonable and prejudiced petitioner.

17  Mr. Berryhill specialized in collecting, preserving, analyzing, and presenting computer-related

18  evidence.  In his declaration, Mr. Berryhill made various points in response to Officer Fagalde's

19  testimony — *e.g.,* it was unclear whether or not the illicit images were deleted by the user

20  subsequent to their download, and differences between a file-access date and file-creation date

21  did not necessarily mean that the image had been intentionally saved and viewed by the user.

22  Former Judge Danser stated in his declaration "that the evidence apart from the computer

23  evidence did not seem to compel a conviction; and that the defense attorney seemed overly

24  enamored with his own computer skills over and above what could be obtained from forensic

25  experts in the field."  These declarations — particularly Mr. Berryhill's — substantially

26  improved the evidentiary basis for petitioner's ineffectiveness-of-counsel arguments, thereby

27  presenting the very type of evidence that the state should have considered in the first instance.

28

United States District Court
For the Northern District of California

13

1    Although this order finds that the declarations by Mr. Berryhill and former Judge Danser

2    substantially improved the evidentiary basis for petitioner's claims, it is not saying that the

3    evidence has improved petitioner's case to the point where, but for Mr. Clancy's alleged

4    mistakes, there was a reasonable probability that the result of the trial would have been

5    different.

6         **2.      INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIMS.**

7         In the alternative, even if the new declarations were admissible, habeas relief should

8    still be denied on the merits.  An application for a writ of habeas corpus may be denied on

9    the merits, notwithstanding the failure of the applicant to exhaust the remedies available

10   in the courts of the state.  28 U.S.C. 2254(b)(2).  Petitioner presented his

11   ineffective-assistance-of-counsel claims to the state court of appeal and to the California

12   Supreme Court in his habeas petition.  Under the Antiterrorism and Effective Death Penalty

13   Act, habeas relief can be granted only if the state court decision is "contrary to, or involved

14   an unreasonable application of, clearly established Federal law, as determined by the

15   Supreme Court of the United States."  28 U.S.C. 2254(d).  *Strickland v. Washington*, 466 U.S.

16   668 (1984), is considered by the Ninth Circuit to be clearly established federal law for

17   analyzing ineffective assistance of counsel claims.  *Wilson v. Henry*, 185 F.3d 986, 988 (9th Cir.

18   1999).

19        *Strickland* sets forth a two-step standard that must be satisfied in order to prove

20   ineffective assistance of counsel.  *Strickland*, 466 U.S. at 687-88.  *First*, petitioner must show

21   that counsel's representation fell below an objective standard of reasonableness (*id*. at 668).

22   The question is not what counsel could have done but whether the choices made by counsel

23   were reasonable.  *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998).  Judicial scrutiny

24   of counsel's performance must be highly deferential, and a court must strongly presume that

25   counsel's actions falls within the wide range of reasonable assistance.  *Strickland*, 466 U.S.

26   at 688.

27        *Second*, petitioner must show that counsel's performance prejudiced petitioner and

28   deprived petitioner of a fair trial and reliable results. The petitioner must prove that, but for

14

1   counsel's errors, there is a reasonable probability that the result of the proceeding would have

2   been different (*id*. at 694).  If the state's case is weak, there is a greater likelihood of a

3   reasonable probability that the trial would have been different.  *Johnson v. Baldwin*, 114 F.3d

4   835, 839–40 (9th Cir. 1997).

5                **A.      Were Trial Counsel's Actions Reasonable?**

6            With the current record, it is unclear whether the choices made by defense counsel not

7   to retain an expert witness and to advise petitioner to testify were reasonable.  On the one hand,

8   Attorney Clancy conferred with Mr. Berryhill *after* trial had begun and the prosecution's

9   expert witness had already testified.  Trial counsel then spent only two hours working with

10  Mr. Berryhill trying to recover information from computers provided by the District Attorney.

11  On the other hand, it may not have been entirely unreasonable that lay jurors could make

12  reasoned judgments after hearing Officer Fagalde's testimony on computer files and the

13  defense's perspective on what the computer evidence actually represented.  Defense counsel

14  also demonstrated for the jury on a computer in the courtroom how newsgroups were accessed

15  and downloaded and how files were accessed and deleted.  Without further information, the

16  Court cannot judge the reasonableness of Attorney Clancy's decision to not hire an expert and

17  to put petitioner on the stand.  The reasonableness issue does not need to be addressed,

18  however, because petitioner failed to show that he was prejudiced by Attorney Clancy's actions,

19  as discussed below.

20                **B.      No Prejudice Due to Trial Counsel's Actions.**

21           The second prong of the *Strickland* test asks whether, but for trial counsel's errors,

22  there was a reasonable probability that the result of the proceeding would have been different.

23  Here, the answer is no.

24           First and foremost, petitioner has not shown that his conviction hinged on the computer

25  evidence and his taking the stand.  As this case was a child-molestation case, the testimony of

26  the child victim held great weight.  *See Bruce v. Terhune*, 376 F.3d 950, 957–58 (holding that a

27  case involving a credibility contest and the child victim's account was not inherently

28  implausible); *People of Territory of Guam v. McGravey*, 14 F.3d 1344,  1346–47 (9th Cir.

*United States District Court*
For the Northern District of California

15

United States District Court
For the Northern District of California

1    1994) (upholding conviction for sexual molestation based entirely on the uncorroborated

2    testimony of the victim).  Here, the victim, her mother, and her aunt all testified about the

3    incidents of molestation.  M.U. stated that she had been inappropriately touched ten or eleven

4    times, and she described four specific incidents that occurred when she was eleven years old or

5    younger.

6         Nothing in the record indicated that the victim was discredited.  Petitioner tried to attack

7    M.U.'s testimony because the child failed to make any molestation allegations against petitioner

8    until she learned that petitioner had permanently refused to reconcile with her mother.

9    This evidence, however, was still consistent with the story of a frightened child victim who

10   chose not to reveal the crime until weeks, months, or years later.  Defense counsel also

11   attempted to undermine M.U.'s credibility by asking M.U. whether she liked to play-wrestle

12   with petitioner and by showing the jury her letters to petitioner.  Again, it is not uncommon for

13   a child victim to express conflicting emotions of fear and affection towards her perpetrator.

14   The Court finds that nothing in the trial record indicated that M.U. was discredited during

15   cross-examination or closing arguments.

16                    *(1)    No Prejudice for Failing to Hire an Expert.*

17        To support his claim of prejudice with respect to the computer-expert claim, petitioner

18   introduced declarations from Mr. Berryhill and former Judge Danser, neither of which was

19   presented to the state courts.  Even if petitioner's own expert testimony would have been

20   devalued to some extent by the jury's viewing him as biased, petitioner has not shown that,

21   had a computer expert like Mr. Berryhill testified, there would have been a reasonable

22   probability that he would not have been convicted.  *First*, defense counsel had tried but was

23   unable to keep the computer evidence from being admitted.  *Second*, on cross-examination,

24   Officer Fagalde acknowledged that some improper windows could pop up beyond the user's

25   control and that it was also possible that child pornography was posted onto adult sites.

26   *Third*, defense counsel demonstrated to the jury on a computer in the courtroom how

27   pornographic images could have been unintentionally downloaded onto petitioner's computer.

28   Mr. Berryhill's declaration shows that defense counsel actually developed upon many of the

16

1    same arguments he would have made — *e.g.*, that it was unclear whether or not the illicit

2    images were deleted by petitioner after download and that it was possible to unknowingly

3    obtain these images in the midst of a mass download. *Fourth*, as discussed earlier, there was

4    the impact of M.U.'s testimony to consider. *Fifth*, the Court gives little import to former Judge

5    Danser's comment "that the evidence apart from the computer evidence did not seem to compel

6    a conviction" as the statement was too conclusory. Moreover, he explicitly denied in his

7    declaration that he had said, "[B]ut for the lawyer, Mr. Upton would be enjoying his freedom."

8                    *(2)    No Prejudice for Testifying on His Own Behalf.*

9           Petitioner also offers nothing in the record to show prejudice due to his testifying on

10   his own behalf. Defense counsel's advice that a defendant testify at his own prosecution

11   (and therefore expose himself to self-incrimination) is not necessarily deficient. *See*, *e.g.*,

12   *United States v. Sanchez-Cervantes*, 282 F.3d 664, 672 (9th Cir. 2002) (holding that defense

13   counsel's advice that defendant testify at his prosecution for drug offenses was not deficient

14   and did not result in any prejudice to defendant, as required to establish ineffective assistance of

15   counsel even though this course of action exposed defendant to cross-examination on past drug

16   convictions). The only effect was that his own expert testimony was somewhat devalued but,

17   as discussed earlier, this result was not prejudicial considering the strength of the rest of the

18   case.

19          Here, the state's case was not weak. Even if the prosecutor had not been able to elicit on

20   cross-examination evidence of the websites petitioner visited, the result of the trial would have

21   been the same in all likelihood. The inculpatory evidence regarding teenage newsgroups and

22   websites was introduced by government expert Officer Fagalde on direct-examination.

23   During cross-examination, the prosecutor asked petitioner about these websites, which had

24   already been presented before the jury. The prosecutor spent the majority of his closing

25   argument discussing M.U.'s testimony rather than the computer evidence. In other words,

26   petitioner's computer activity did and would have come into evidence regardless of whether or

27   not petitioner took the stand. The evidence was already overwhelming before petitioner took

28   the stand.

**United States District Court**
For the Northern District of California

17

**CONCLUSION**

Petitioner's ineffective-assistance-of-counsel claim regarding the failure to hire a

computer-expert was not exhausted because of the new declarations filed with his federal

habeas.  Nonetheless, the Court here reviewed the petition on its merits pursuant to 28 U.S.C.

2254 (b)(2).  The Court finds that petitioner did not meet the *Strickland* standard because he

failed to show prejudice by trial counsel's conduct.  The plaintiff's petition for writ of habeas

corpus is **DENIED** with prejudice.


**IT IS SO ORDERED.**


Dated:  October 15, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

18